IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re REDSKINS GRILLE 1, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| OLD TOWN FOOD SERVICE, LLC, et al., | ) | 19-cv-00633 (LMB/MSN) |
| | ) | |
| Appellants, | ) | 18-01045-KHK |
| | ) | |
| v. | ) | |
| | ) | |
| H. JASON GOLD, | ) | |
| | ) | |
| Appellee. | ) | |

## MEMORANDUM OPINION

Before the Court is an appeal from a decision of the bankruptcy court in an adversarial proceeding brought by bankruptcy trustee H. Jason Gold ("Trustee" or "appellant") against defendants Old Town Food Service, LLC ("OTFS"), FML, LLC ("FML"), and Noe Landini ("Landini," and collectively with OTFS and FML, "appellants"). At issue in this appeal is whether the bankruptcy court erred in granting the Trustee's motion for summary judgment and denying appellants' motion for summary judgment. For the reasons set forth below, the decision of the bankruptcy court will be affirmed in part and remanded for further proceedings consistent with this Memorandum Opinion.

I. BACKGROUND

### A. **Factual Background**

Redskins Grille 1, LLC ("debtor") formerly operated a Washington Redskins-themed restaurant at One Loudoun Shopping Center in Ashburn, Virginia. First Amended Complaint ("Compl.") [Bankr. Dkt. 25] ¶ 5. The restaurant space was originally leased from One Loudoun

Downtown, LLC, but the lease was subsequently assigned to RPAI Ashburn Loudoun, LLC ("landlord"). Id. ¶ 13. In January 2017, the debtor filed a petition for Chapter 11 bankruptcy, which in August 2017 was converted into a petition for Chapter 7 bankruptcy. Id. ¶ 9–10. Gold was subsequently appointed as the debtor's bankruptcy trustee. Id. ¶ 11. In that capacity, he sought to sell the debtor's restaurant assets and assign the debtor's restaurant lease. Id.

In September 2017, the bankruptcy court approved bidding procedures for the sale ("bidding procedures"). Compl. ¶ 13. The bidding procedures set out the bidding process at length, including numerous requirements that prospective buyers needed to satisfy for their bids to be considered. For example, bidders were required to submit a "bid form" listing the name of the bidder, stating the initial cash bid, and describing the proposed use of the premises, among other pertinent information. Appellants' Appendix ("Appx.") [Dkt. 5-1] at 110. Bidders also had to make an "initial deposit" of $100,000 and provide "documentation sufficient, in the judgment of [the Trustee], to verify [their] financial capability to close the transaction." Id.

Under the bidding procedures, initial bids would be accepted until "5:00 p.m. on September 20, 2017." Id. After the bidding period had concluded, the Trustee would "identify the highest and best [i]nitial [b]id, as determined at [his] discretion . . . , and deem such qualified bidder the stalking horse bidder for purposes of the [f]inal [a]uction." Id. at 112. If the Trustee "determine[d] that there [were] no qualified bidders, the [final] auction [would] be cancelled;" otherwise, the final auction would be an "oral auction" held on October 17, 2017. Id. at 113–14. "Following the [f]inal [a]uction, the party making the [s]uccessful [b]id [would] execute an asset purchase agreement for the [r]estaurant [p]roperty, which [would] be shared with [the landlord] on October 17, 2017." Id. at 114. A sale hearing would occur before the bankruptcy court on October 24, 2017, and provided that the bankruptcy court "enter[ed] an Order approving the

sale . . . [as] consistent with the requirements of the Bankruptcy Code," closing would occur by October 31, 2017. Id. The landlord retained the right to "object[] to the inclusion of any qualified [b]idders in the [f]inal [a]uction . . . on or before October 6, 2017." Id. at 113.

On September 20, 2017, "Old Town Food Services LLC t/a Fish Market" submitted a bid pursuant to the bidding procedures. Id. at 91. That bid included a cash bid of $700,000, with a "non-binding allocation" of $200,000 for the restaurant assets and $500,000 for the restaurant lease, and indicated the bidder's intent to open a "[r]estaurant specializing in seafood." Id. The top of the bid form stated: "The undersigned hereby submits this bid for substantially all of the assets of the [debtor], subject to the execution of a mutually agreeable [a]sset [p]urchase [a]greement, . . . and subject to the approval of the U[nited] S[tates] Bankruptcy Court [for the] Eastern District of Virginia." Id.

The bid form listed the "[n]ame of the [b]idder" as "Old Town Foods Services LLC t/a Fish Market," the "[i]dentity of the [p]roposed [t]enant" as "Same t/a Fish Market," and the "[p]roposed name under which the assignee intends to operate" as "Fish Market," and was signed by Landini in his capacity as a "[m]ember/[m]anager" of "Old Town Seafood LLC." Id. at 91–92. The record shows that Landini initially intended to create Old Town Seafood LLC to be both the ultimate owner of the restaurant assets and lease and the operator of the new restaurant. See generally Compl. ¶¶ 34–43. As discussed below, Old Town Seafood LLC was never created; rather, Landini eventually created FML to be both the ultimate owner of the restaurant assets and lease and the operator of the new restaurant. Id. Landini was at all relevant times a member and manager of both OTFS and FML. Id.

Because the Trustee received no other qualifying bids during the bidding period, no final auction was ever held. Compl. ¶¶ 18, 25. On September 29, 2017, the Trustee filed a motion with

3

the bankruptcy court seeking the court's approval of the sale to OTFS. Id. ¶ 19. On October 6, 2017, the landlord objected to the sale. Id. ¶ 19. As a result of that objection, the bankruptcy court scheduled a hearing to consider both the Trustee's motion to approve the sale and the landlord's objection. Id. ¶¶ 20–22.

At the hearing ("sale hearing"), the bankruptcy court considered whether the sale should be approved pursuant to 11 U.S.C. §§ 363, 365. Under these code sections, the court needed to determine whether the sale was "in the best interests of the estate" and whether the Trustee had provided "adequate assurance" of the tenant's future performance under the lease. Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A., 816 F.3d 273, 279 (4th Cir. 2016); In re Trak Auto Corp., 367 F.3d 237, 242 (4th Cir. 2004). Focusing on the latter requirement, the landlord argued that "there[] [was] a big question mark as to [the tenant's] ability to perform" under the lease. Appx. at 147. Specifically, the landlord argued that the bankruptcy court should not approve "a proposal to sign [sic] a lease to an entity that doesn't exist" and that as a result was "not obligated to do anything." Appx. at 227. The landlord also argued that once this new entity was created, "it [would] be completely reliant until [the restaurant] open[ed] on the influx of cash from the principals into the company." Id. at 146. In this vein, the landlord explained that the new entity planned to make substantial renovations to the restaurant space that would take at least six months to complete. See id. at 231. During that time, the restaurant would not be open for business, which would put the new entity in default under a provision of the lease that prohibited closure for more than 90 days, and the landlord emphasized that this extended closure added to the uncertainty as to the new entity's financial ability to perform under the lease. See id.

Several witnesses testified at the sale hearing, including the Trustee and Landini, whose interests at that hearing were essentially aligned. Among other matters, the Trustee testified that

the sale presented a "win-win-win-win-win situation," benefitting all parties involved, including the landlord, because the landlord would ultimately get a much more reliable tenant than the debtor. Id. at 168. Similarly, among other matters, Landini's testimony emphasized that although the new entity would indeed need to make substantial renovations to the restaurant space that would take at least six months, the new entity would be "capitalized sufficient" to pay the rent due under the lease during and after that renovation period. Id. at 192. Both the Trustee and Landini testified that OTFS t/a Fish Market submitted the bid at issue, even though a new entity was going to be created to be the ultimate owner of the restaurant assets and lease. Id. at 165, 172, 189.

At the conclusion of the sale hearing, Herbert Rosenblum, counsel for OTFS, asked to be heard. Id. at 236. Rosenblum was concerned with the lease provision stating that the tenant would be in default if it remained closed for more than 90 days, and specifically was concerned that the landlord would declare the new entity in default during the six-month renovation period. Id. at 237–38. Rosenblum asked the bankruptcy court "to say that . . . it's understood that the [renovations] could take up to six months and maybe more," and that the landlord could not declare the new entity in default during that time. Id. The Trustee also asked to be heard, and told the bankruptcy court that he believed Rosenblum's concerns were with "the language in the order" that the court was going to issue approving the sale. Id. at 239. The bankruptcy court ultimately agreed to take up the issue at a later time, once it had received a draft of the sale order from the Trustee. Id. at 239–40.

On November 13, 2017, the bankruptcy court issued a related order regarding the proceeds of the sale ("carve-out order"). Id. at 581–82. The order stated that the debtor's estate would "be entitled to a carve-out from the proceeds from the [s]ale." Id. Specifically, the order

stated that debtor's estate would be entitled to (1) "5% of the gross sales price, to be reserved for allowed administrative and unsecured claims" against the estate, (2) "[t]he amount required to cure existing defaults with respect to the [l]ease," (3) an "[a]uctioneer's [f]ee" in the amount of "7% of the sale price," (4) "[a]dvertising costs" in an amount up to "$4,000," (5) "[o]ther necessary costs . . . estimated at $1,000," (6) the Trustee's "legal fees" up to "$75,000 . . . as approved by the Court," (7) the Trustee's "commission" to be "[c]alculated pursuant to 11 U.S.C. § 326(a) upon the final sale price . . . as approved by the Court," and (8) "if applicable," a $25,000 "[b]reak [u]p [f]ee." Id. Based on the $700,000 purchase price, the debtor's estate would be entitled to approximately $462,571. The remainder of the sale proceeds would go to First Republic Bank and Herman/Stewart Construction and Development, Inc., two secured creditors with substantial liens on the debtor's restaurant assets and lease. Id.

On November 14, 2017, Rosenblum and the landlord submitted letters to the bankruptcy court regarding the draft sale order. Rosenblum's letter identified himself as counsel for "the [b]uyer, FML LLC, which is being formed to purchase the [debtor's] assets including the assumption and assignment of the lease." Id. at 247. The letter explained that Landini "testified unequivocally [at the sale hearing] that [the new entity] needed six months from the issuance of a building permit to make the needed [renovations] to the premises," and that "[w]ithout the assurances that FML LLC, the prospective [b]uyer, will be afforded the necessary time to make the [renovations] which it requires to make the restaurant successful, it will elect not to pursue the transaction." Id. The letter accordingly proposed that the sale order include language explicitly permitting "the prospective [b]uyer, FML LLC, . . . to remain closed during [the] renovations for a period of six month[s] post issuance of the building permit." Id.

The landlord's letter outlined numerous objections to the draft sale order. Id. at 249. As relevant here, the letter explained that Rosenblum was impermissibly seeking to modify the lease, in violation of "well-settled law" that "an assignee assumes a lease [without modification]," and that such modification would be "contrary to both justice and equity." Id. at 250–52. The letter specifically objected to the addition of any language that would have the effect of modifying the lease, including language permitting the new entity to remain closed during the six-month renovation period. Id. at 254–55.

On November 15, 2019, the bankruptcy court held a telephonic hearing to resolve the issues regarding the language in the draft sale order. Rosenblum appeared "for the buyer," and alerted the court that "the buyer is unwilling to proceed if we have an unwilling landlord." Id. at 261, 277. Rosenblum emphasized that the new entity would not be "held hostage" and forced to complete its renovations in a three-month period so as not to be in default under the lease; rather, the new entity was prepared to "walk away." Id. at 277. Ultimately, the court explained that it would "allow the renovations to be made . . in accordance with the testimony" at the sale hearing, meaning "within six months." Id. at 279. The court also explained that it "ha[d] no problem inserting [the language proposed by Rosenblum] into the form of the order," with the exception that the six-month renovation period would run from the assumption and assignment of the lease, not from the issuance of a building permit. Id. at 280. The court "[found] all of that to be reasonable." Id. To the extent that there were any outstanding issues with the landlord, the court made clear they were "for the parties to resolve on a business basis, not . . . anything for [the court] to impose." Id. at 281.

On November 16, 2017, the bankruptcy court issued the sale order ("sale order"), which included numerous findings and conclusions discussed further below. Appx. 292–98. Most

7

significantly, the sale order identified the "[b]uyer" as "Old Town Food Services LLC or its assigns," and found that the $700,000 purchase price was "fair and reasonable," as well as that Landini was "in a position to close the transaction immediately." Id. The sale order also included the provision requested by Rosenblum, which stated that the "[b]uyer shall conduct renovations at the premises . . . and the premises may remain closed during said renovations for a period of six months in order for [the] [b]uyer to complete said work." Id. In effect, the sale order granted the Trustee's sale motion, overruled the landlord's objection, and ordered that "the sale of the [r]estaurant [a]ssets to [the] [b]uyer shall be . . . valid, legal, binding, and effective." Id. No party appealed the sale order. Id.

Four days later, on November 20, 2017, FML was created. Compl. ¶ 39. On the same day, the Trustee delivered a "Bill of Sale/Assignment and Assumption Agreement." Id. ¶ 33. On November 29, 2017, Rosenblum sent a letter to the Trustee advising him that FML "ha[d] decided not to proceed with the purchase" because of Landini's "sense that the Landlord was not pleased (much less excited) that the successful Fish Market concept would soon be its tenant," and because the landlord's "unwillingness to work with [Landini] would lead to a stressful relationship." Appx. at 301. As a result, no asset purchase agreement or bill of sale was signed, and no closing occurred. The Trustee has retained the $100,000 deposit that had been submitted with OTFS's initial bid. Compl. ¶ 66.

### B. Procedural History

On April 19, 2018, the Trustee filed a one-count complaint in an adversarial proceeding in the United States Bankruptcy Court for the Eastern District of Virginia.[1] The complaint

---

[1] All of the sale proceedings had been handled by Bankruptcy Judge Kevin R. Heunnekens; however, Bankruptcy Judge Klinette H. Kindred resolved the adversarial proceeding, and is currently handling the remainder of the debtor's bankruptcy proceedings.

8

alleged breach of contract against OTFS. In response, OTFS raised an issue regarding whether it could be held liable for breach of contract given that a new entity was always intended to be both the ultimate owner of the restaurant assets and lease and the operator of the new restaurant. As a result, on August 21, 2018, the Trustee filed a four-count amended complaint. In Counts 1, 2, and 3, respectively, the complaint alleges breach of contract against OTFS, FML, and Landini, and in Count 4 the complaint alleges a claim of alter-ego liability against Landini based on his role as a member and manager of FML. On September 26, 2018, OTFS and FML filed a one-count counterclaim against the Trustee seeking the return of the $100,000 deposit. Subsequently, the Trustee and OTFS filed cross-motions for summary judgment on Count I, FML filed a motion for summary judgment on Count 2, Landini filed a motion for summary judgment on Counts 3 and 4, and OTFS and FML filed a motion for summary judgment on their counterclaim. On May 10, 2019, the bankruptcy court issued an order granting the Trustee's motion, and denying appellants' motions. As a result, the bankruptcy court ordered OTFS to pay the Trustee $600,000, which reflects the $700,000 initial bid less the $100,000 deposit, which the court declined to return to OTFS and FML.

The bankruptcy court reasoned that "the sale order [was] expositive of the issue of whether a contract was formed" with OTFS, and that "it follow[ed] that the breach occurred when [OTFS], by the letter from [Rosenblum] to [the Trustee], dated November 29, 2017, gave notice that it was refusing to close on the transaction." Appx. at 701, 705. "Having found that a contract was formed between the Trustee and [OTFS], and that [OTFS] breached that contract," the court "decline[d] to . . . use the carve-out order as a measure of damages," as requested by OTFS, "because nothing in the documents provided [spoke] to damages should either party

9

default on the contract." Id. Instead, the court found that "the Trustee [was] entitled to expectation damages" in the total amount of $700,000. Id.

Although "[t]he most complicated among these" issues was "whether a contract was formed" with OTFS, the bankruptcy court concluded that OTFS was collaterally estopped from arguing that issue because the sale order "clearly indicate[d] that the Court found that the parties were bound by [a] contract, [the] terms [of which] were listed in the order." Appx. at 698, 701. Specifically, the sale order "identifie[d] [OTFS] or its assigns as the offeror," "state[d] that the Trustee had accepted [OTFS's] offer to pay $700,000 to purchase the debtor's assets," and "recite[d] that the [b]uyer [was] prepared to close the transaction immediately." Id. As a result, the sale order "order[ed] that the sale of the assets [to] the [b]uyer shall be valid, legal, binding, and effective." Id.

In collateral estoppel terms, the bankruptcy court explained that "[t]he issue of whether or not a contract existed was most certainly before the [c]ourt," and that "without a contract between [the Trustee] and the [b]uyer the [c]ourt could not have approved the sale." Id. at 703. OTFS also "certainly had an opportunity to litigate" the issue at the sale hearing and subsequent telephonic hearing, "[a]s evidenced by the inclusion [in the sale order] of a clause which allow[ed] the [b]uyer to renovate the property" for a period of six months. Id. Although OTFS "could walk away from the transaction" before the sale order was entered, it "chose not to walk away because it wanted to close on the transaction" and thereby "assume[d] the risk that it would be unable to settle its disputes with the landlord." Id. at 704. In other words, "[o]nce the sale order was entered, the risk of dealing with the landlord became the [b]uyer's risk to shoulder" because "[t]he [b]idder subjects itself to the jurisdiction of the [c]ourt, and in effect, by making

10

his bid, becomes a party to the proceeding in which the sale is made," allowing it to "be compelled to complete his purchase by the process of the [c]ourt." Id. at 700, 704.

This appeal followed.

## II. DISCUSSION

The crux of the adversarial proceeding was an alleged contract between the Trustee and OTFS in which OTFS agreed to purchase assets owned by, and take assignment of a lease held by, the debtor. On appeal, OTFS argues that the bankruptcy court erred in holding that OTFS was collaterally estopped, based on the terms listed in the sale order, from challenging whether a contract was formed. OTFS also argues that no enforceable contract was ever formed because the bid form contained a condition precedent to contract formation—the execution of an asset purchase agreement—which was never satisfied, necessitating summary judgment in its favor. The Trustee argues that the bankruptcy court properly held that OTFS was collaterally estopped from challenging whether a contract was formed because in issuing the sale order the bankruptcy court found all of the elements necessary for contract formation and therefore found that the sale was valid, legal, binding, and effective. The Trustee alternatively argues that an enforceable contract was formed because there was no requirement that an asset purchase agreement be executed.

The parties also disagree about the amount of damages that should be awarded to the Trustee if the bankruptcy court's decision is affirmed. The Trustee argues that the bankruptcy court properly awarded him the purchase price of $700,000. OTFS argues that the bankruptcy court erred in not limiting the Trustee's damages to the amount in the carve-out order, approximately $462,571. For the reasons set forth below, the decision of the bankruptcy court will be affirmed as to its conclusion regarding collateral estoppel and contract formation;

however, because there is an insufficient record to review whether the bankruptcy court properly awarded the Trustee the purchase price as opposed to the amount in the carve-out order as a measure of his expectation damages, the decision of the bankruptcy court will be remanded in part.

### A. Standard of Review

"When reviewing a decision of the bankruptcy court, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal." United States v. Copley, 591 B.R. 263, 268 (E.D. Va. 2018) (quotation omitted). Accordingly, "[t]he district court reviews the bankruptcy court's legal conclusions de novo and its factual findings for clear error." Id. "A finding of fact is clearly erroneous if a court reviewing it, considering all of the evidence, 'is left with the definite and firm conviction that a mistake has been committed.'" Id. (quotation omitted). It is undisputed that whether collateral estoppel applies and whether an enforceable contract was formed are both questions of law.

### B. Analysis

Because the application of collateral estoppel would obviate the need to evaluate OTFS's argument that no enforceable contract was ever formed, the Court begins by examining whether the bankruptcy court correctly applied collateral estoppel.

"Federal law governs the [preclusive] effect of earlier bankruptcy proceedings." Covert v. LVNV Funding, LLC, 779 F.3d 242, 245 (4th Cir. 2015). Under federal law, "[a] party seeking to rely on the doctrine of collateral estoppel is obliged to establish five elements:"

> (1) that 'the issue sought to be precluded is identical to one previously litigated' ('element one'); (2) that the issue was actually determined in the prior proceeding ('element two'); (3) that the issue's determination was 'a critical and necessary part of the decision in the prior proceeding' ('element three'); (4) that the prior judgment is final and valid ('element four'); and (5) that the party against whom collateral estoppel is asserted 'had a full and fair opportunity to litigate the issue in the previous forum' ('element five').

Collins v. Pond Creek Mining Co., 468 F.3d 213, 217 (4th Cir. 2006). Each element will be discussed in turn.

The first three elements of collateral estoppel are closely related. The first addresses whether the issue sought to be precluded in the current proceeding is the same as an issue that was before the court in a prior proceeding, the second addresses whether that issue was actually litigated and determined in the prior proceeding, and the third addresses whether that issue was necessarily determined in the prior proceeding. See, e.g., Realvirt, LLC v. Lee, 179 F. Supp. 3d 604, 607–08 (E.D. Va. 2016); United States v. Maxwell, 189 F. Supp. 2d 395, 402–03 (E.D. Va. 2002). Here, it is undisputed that the issue sought to be precluded is whether an enforceable contract was formed between the Trustee and OTFS.[2]

With regard to the first element, numerous findings and conclusions in the sale order demonstrate that the issue of whether an enforceable contract was formed between the Trustee and OTFS was before the bankruptcy court. For example, the sale order included all of the elements of an enforceable contract, identifying the "[b]uyer" as "Old Town Food Services LLC

---

[2] OTFS also argues in passing that it should be permitted to challenge the identity of the buyer, asserting that OTFS was a "nominal bidding party" or "placeholder" for a new entity that would "carry out the purchase." Brief for Appellants at 20. The bankruptcy court persuasively explained that OTFS is collaterally estopped from raising such a challenge. The sale order "identifie[d] Old Town Food or its [a]ssigns as the [b]uyer," and Landini testified at the sale hearing that the bid form at issue was "the bid that the entity Old Town Food Services ha[d] placed for the assets in this case." Appx. at 698–99. Additionally, "Judge Huennekens could not have entered a sale order without identifying the . . . [b]uyer," as he was required to determine whether "the Trustee demonstrated adequate assurance of future performance by the [b]uyer, and that the [b]uyer was a good faith purchaser as required under the [Bankruptcy] Code." Id. at 698. "This would not have been possible without identifying the . . . [b]uyer." Id. at 698–99. Lastly, OTFS "had an opportunity to contest the sale order listing the company as the buyer up until the day the sale order was entered." Id. at 700–01. "Having failed to do so," OTFS "[is] now collaterally estopped from challenging the [c]ourt's designation" of OTFS or its assigns as the buyer. Id. at 701.

or its assigns," finding that the $700,000 purchase price was "fair and reasonable," and finding that Landini was "in a position to close the transaction immediately." Appx. at 292–98. It also found that the sale "was negotiated, proposed, and entered into by the parties without collusion, in good faith, and from arm's length bargaining positions," and that "the sale of the [r]estaurant [a]ssets to [b]uyer shall be . . . valid, legal, binding, and effective." Id. Because a ruling in favor of OTFS on this issue would require the bankruptcy court to overrule these findings and conclusions, the Trustee has satisfied the first element of collateral estoppel. See, e.g., In re Farmland Indus., Inc., 376 B.R. 718, 727 (Bankr. W.D. Mo. 2007) ("The first element [of collateral estoppel] requiring an identity of issues is met because . . . relief cannot be granted on [the plaintiff's] complaint without overruling numerous findings from the [s]ale [o]rders.").

This conclusion is further supported by testimony offered at the sale hearing. For example, both the Trustee and Landini identified OTFS at the entity submitting the bid at issue on behalf of a new entity which was going to be created to serve as the ultimate owner of the restaurant assets and lease and as the operator of the new restaurant. Appx. at 165, 172, 189. This understanding was clearly reflected in the sale order's identification of the buyer as "Old Town Food Services LLC or its assigns." Id. at 292–98. The Trustee also testified that the bid was "clean," meaning "it wasn't contingent on anything," and that the full purchase price "would be paid immediately at closing," which would occur "in the next few days." Id. at 166–67. Landini confirmed that he was in a position to close on the sale "immediately," and also testified that he "[did not] recall" whether he had "signed an asset purchase agreement of any sort" with the Trustee." Id. at 194, 207–08. These statements further demonstrate that the issue of whether an enforceable contract was formed, including whether there was a condition precedent to contract

14

formation that might affect the bankruptcy court's decision to approve the sale, was before the court during the sale proceedings.

With regard to the second element, the same findings and conclusions in the sale order, and testimony offered at the sale hearing, demonstrate that the issue of whether an enforceable contract was formed between the Trustee and OTFS was actually litigated and determined. Additionally, in response to the lengthy letters submitted to the bankruptcy court and the telephonic hearing, the sale order also included the provision, requested by Rosenblum, who was at all times representing the buyer's interests, stating that the "[b]uyer shall conduct renovations at the premises . . . and the premises may remain closed during said renovations for a period of six months in order for [the] [b]uyer to complete said work." Appx. at 292–98. Because the parties plainly litigated, and the court plainly determined, the effect of the sale upon OTFS, the Trustee has satisfied the second element of collateral estoppel. Cf. In re Zola Petroleums, LLC, 482 B.R. 154, 163–64 (Bankr. E.D. Va. 2012) (holding that the second element of collateral estoppel was not satisfied because the sale order "never passed on the effect of the transaction" upon the party against whom collateral estoppel was asserted).

With regard to the third element, and further supporting the bankruptcy court's conclusions regarding the first two elements, judicial sales and the sale orders that effectuate them are unique. A sale order "is the judicial sanction of the court," and upon its entry "the purchaser is entitled to the full benefit of his contract, which is no longer executory but executed, and which will be enforced against him and for him." Langyher v. Patterson & Bash, 77 Va. 470, 473 (Va. 1883) (citing several treatises on judicial sales); see also Nassabeh v. Montazami, 2019 WL 3892863, at *4 (Va. Cir. Ct. Feb. 7, 2019) (reaffirming this principle). In other words, "[a]s soon as the sale is confirmed by the court there is a completed contract; the bidder becomes

15

a purchaser, and is thenceforth regarded and treated as the equitable owner of the land, with the right reserved to compel him to comply with his contract by payment of his purchase money." Langyher, 77 Va. at 473. Because the bankruptcy court necessarily determined in the sale order that an enforceable contract was formed between the Trustee and OTFS, the Trustee has satisfied the third element of collateral estoppel. Cf. Zola, 482 B.R. at 164 (holding that the third element of collateral estoppel was not satisfied because the issue of a third-party's rights upon entry of the sale order "did not have to be raised or addressed in order for the sale to be approved").

The fourth element of collateral estoppel addresses whether the judgment rendered in the prior proceeding was both final and valid. Here, the parties do not dispute that a bankruptcy court's sale order is a final and valid judgment for preclusion purposes, and Fourth Circuit precedent confirms as much. See Providence Hall, 816 F.3d at 280. Accordingly, the Trustee has satisfied the fourth element of collateral estoppel.

Lastly, the fifth element of collateral estoppel addresses whether the party against whom collateral estoppel is being asserted in the current proceeding had sufficient opportunity to litigate the issue in the previous proceeding. The "general rule" is that collateral estoppel "applies only against persons who were parties to the prior suit, because . . . nonparties will not have had a full and fair opportunity to litigate the issues raised in the previous action." Martin v. Am. Bancorporation Retirement Plan, 407 F.3d at 654 n.18 (4th Cir. 2005). The Supreme Court has articulated the following six exceptions to the general rule:

> (1) the nonparty agreed to be bound by the litigation of others; (2) a substantive legal relationship existed between the person to be bound and a party to the judgment; (3) the nonparty was adequately represented by someone who was a party to the suit; (4) the nonparty assumed control over the litigation in which the judgment was issued; (5) a party attempted to relitigate issues through a proxy; or (6) a statutory scheme foreclosed successive litigation by nonlitigants.

Eastern Associated Coal Co. v. Office of Workers' Comp. Programs, 578 F. App'x 165, 175 (4th Cir. 2014); see also Ducket v. Fuller, 819 F.3d 740, 745 (4th Cir. 2016).

Here, OTFS was effectively a party to the prior proceeding, as a purchaser in a judicial sale "becomes a party to the sale," and "may appear before the court" to represent its interests. Carr v. Carr, 14 S.E. 368, 370 (Va. 1892); see also Shenandoah Cty. Sch. Bd. v. Bd. of Sup'rs of Shenandoah Cty., 36 S.E.2d 620, 624 (Va. 1946); French v. Phipps, 198 S.E. 458, 460 (Va. 1938). But see Matter of Richman, 104 F.3d 654, 657 (4th Cir. 1997) ("As a general matter, in a Chapter 7 proceeding, the trustee alone has standing to raise issues before the bankruptcy court and to prosecute appeals."). Indeed, Rosenblum made several appearances on behalf of the buyer before the bankruptcy court. Rosenblum appeared at the sale hearing, asked to be heard, and was heard regarding the lease provision which provided that the tenant would be in default if it remained closed for more than 90 days. Appx. at 237–38. After the hearing, Rosenblum submitted a letter to the bankruptcy court which proposed that the sale order include certain language about that lease provision. Id. at 247. Finally, Rosenblum participated in the telephonic hearing during which he argued for his proposed language and after which the court agreed to include most of his proposed language. Id. at 280. Such involvement is consistent with party status and establishes that OTFS had a full and fair opportunity to litigate issues during the sale proceeding.

Even if OTFS had not been not a party to the sale proceeding, it appears to concede that its interests were adequately represented by the Trustee during that proceeding. A non-party's interests are adequately represented if (1) "the interests of the nonparty and his [or her] representative are aligned, and (2) either the party understood [himself or] herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty."

Eastern Coal, 578 F. App'x at 175. Here, OTFS emphasizes that both it and the Trustee were "aligned on the same side of the issues during the sale hearing" because they were "hoping that the sale would work out." Brief for Appellants at 17–18. Additionally, Rosenblum's involvement, as well as the bankruptcy court's inclusion of his proposed language about the time needed to renovate the restaurant space, demonstrates that the court took great care to protect OTFS's interests. Because OTFS had a sufficient opportunity to litigate in the prior proceeding, the Trustee has satisfied the fifth element of collateral estoppel.

The Trustee having satisfied all five elements of collateral estoppel, the bankruptcy court properly determined that OTFS was precluded from challenging whether a contract was formed based on the terms in the sale order.[3] OTFS's breach of that contract when it refused to close on the sale is undisputed. Accordingly, the bankruptcy court properly granted summary judgment in favor of the Trustee on Count 1, and all that remains to be determined is the amount of damages to which the Trustee is entitled.

As previously discussed, the bankruptcy court awarded the Trustee $600,000, which reflects the purchase price less the initial deposit, which the Trustee has retained. The Trustee

---

[3] Even if the Court were to consider the merits of OTFS's argument that no enforceable contract was ever formed, that argument would fail. As previously discussed, "[a]s soon as the sale is confirmed by the court there is a completed contract; the bidder becomes a purchaser, and is thenceforth regarded and treated as the equitable owner of the land, with the right reserved to compel him to comply with his contract by payment of his purchase money." Langyher, 77 Va. at 473. OTFS maintains that the existence of a condition precedent which was never satisfied—the execution of an asset purchase agreement—prevented contract formation. Although this argument may be persuasive in other contexts, see, e.g., Golding v. Floyd, 539 S.E.2d 735, 737 (Va. 2001), "[t]he court, in confirming a sale, may ratify various irregularities in the proceeding of the commissioner of sale, even the changing of the terms of sale, and supply or cure all defects in the execution of its decree, except those founded in defect of jurisdiction, or in fraud." Langyher, 77 Va. at 473. Accordingly, the sale order resolved any outstanding issues regarding the existence of a condition precedent, as well as any issues regarding the identity of the buyer.

maintains that this is the proper measure of its expectation damages. OTFS argues that the Trustee's expectation damages are actually $462,571.11 because the carve-out order limited the amount of the sale proceeds that the Trustee would have retained, the remainder going to the two secured creditors who had substantial liens on the debtor's restaurant assets and lease.

In addressing these argument, the bankruptcy court simply stated that it "decline[d] to ... use the carve-out order as a measure of damages," as requested by OTFS, "because nothing in the documents provided [spoke] to damages should either party default on the contract," and therefore found that "the Trustee [was] entitled to expectation damages" in the total amount of $700,000. Appx. at 706. Because the bankruptcy court "has not sufficiently articulated" its reasoning on this issue, this Court "does not have a sufficient record upon which to review" the decision. Farmer v. First Va. Bank, 22 B.R. 488, 491 (Bankr. E.D. Va. 1982). Accordingly, this adversarial proceeding will be remanded to the bankruptcy court to determine the amount of damages to which the Trustee is entitled, and in doing so to more fully address these arguments. Id.; see also Brewster of Lynchburg v. Dial Corp., 33 F.3d 355, 366–67 (4th Cir. 1994) (remanding a case because "the lower court fail[ed] to provide any reasoning"). The bankruptcy court should bear in mind that, as a court of equity, it may take into consideration that the record reflects it was the landlord, and not OTFS, that unduly hindered this transaction.

Additionally, throughout this litigation, the Trustee has maintained that if he prevailed on his breach of contract claim against OTFS, he would move to dismiss the remaining counts of the amended complaint. The bankruptcy court summarily denied OTFS and FML's motions for summary judgment as to Counts 2–4, and those defendants have challenged that denial on appeal; however, this Court's affirmance of the bankruptcy court's decision as to Count 1 obviates the need to address Counts 2–4 because that affirmance disposes of all issues between

the parties, except for the damages due to the Trustee. Accordingly, on remand, the bankruptcy court should dismiss Counts 2–4, as well as OTFS and FML's counterclaim.

III. CONCLUSION

For the reasons stated above, by an order the bankruptcy court's decision granting summary judgment to the Trustee on Count 1 of the amended complaint, and denying summary judgment to OTFS and FML on their counterclaim, will be AFFIRMED in all respects, except for the bankruptcy court's conclusion about the amount of damages to which the Trustee is entitled which, along with Counts 2–4, will be REMANDED for further proceedings consistent with this Memorandum Opinion.

Entered this 27 day of February, 2020.

Alexandria, Virginia

/s/            
Leonie M. Brinkema
United States District Judge